**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | No. CR-12-1471-TUC-CKJ (BGM) |
|             Plaintiff, ) | |
| ) | **REPORT & RECOMMENDATION** |
| vs. ) | |
| ) | |
| CARLOS POOM-MEDINA, ) | |
| ) | |
|             Defendant. ) | |

Currently pending before the Court is Defendant Carlos Poom-Medina's Motion to Suppress Evidence and Statements [Doc. 25]. Defendant is charged with one count of being an illegal alien in possession of a firearm in violation of 18 U.S.C. § 922(g)(5)(A) and 924(a)(2). Defendant seeks suppression of the firearm and statements regarding his citizenship. Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Macdonald for an evidentiary hearing and a report and recommendation. On November 14, 2012, the matter was heard by Magistrate Judge Macdonald and taken under advisement. Minute Entry 11/14/2012 [Doc. 33]. The Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's motion.

## I.   FACTUAL BACKGROUND

Late in the evening of June 2, 2012, United States Border Patrol agents detained a Mexican citizen attempting to cross back into Mexico at the Nogales DeConcini Port of Entry. Hr'g Tr. 11/14/2012 [Doc. 37] 9:14-10:13; 84:10-17. At approximately 9:00 or 10:00 p.m., Border Patrol brought the individual to the Alien Smuggling Immigration and

1  Deterrence ("ASID") detention facility. *Id.* at 9:1-10; 11:1-4; 84:23-25; 117:3-12. The
2  Mexican national sought to talk to ASID agents and described himself as a foot guide. *Id.*
3  at 11:11-12:14; 84:10-22. Agent Roberto Heredia testified that the foot guide informed him
4  that he had led a group of nine undocumented aliens to a location near the Green Valley,
5  Arizona rest area. *Id.* at 12:7-14. Agent Heredia further testified that the foot guide and
6  other undocumented aliens were picked up from the Green Valley location and taken to a
7  residence located in Tucson, Arizona. Hr'g Tr. 11/14/2012 [Doc. 37] at 13:10-14:2. The
8  foot guide told Agent Heredia that he had taken aliens to this house in the past. *Id.* at 14:21-
9  15:5; *see also id.* at 74:7-15. The foot guide also informed Agent Heredia that at the house
10 he spoke with "Carlos," who paid for his shuttle ticket to be transported to Nogales, Arizona.
11 *Id.* at 15:5-17:5. Agent Heredia testified that the foot guide initially told him that the
12 residence was on Presidente Street in Tucson, Arizona. *Id.* at 14:14-20. Agent Heredia
13 narrowed this down to President Street. *Id.* at 14:14-20; 42:10-14; *see also id.* at 85:19-23.
14 The foot guide told agents that the undocumented aliens might still be in the house. Hr'g Tr.
15 11/14/2012 [Doc. 37] at 17:7-12; 40:8-10. Agent Heredia testified that the foot guide
16 explained to him how to knock on the back door and what to say to Carlos to get him to open
17 the door. *Id.* 15:15-16:6.

18        Agent Heredia testified that immediately after the interview with the foot guide ended,
19 he and other agents sought permission from Watch Commander Tucker to take the guide to
20 Tucson and have him show the location of the residence. *Id.* at 17:13-22. A plan was
21 formulated and two vehicles containing Agents Heredia, Gonzales, Andreasen, and Diaz, and
22 Field Operating Supervisor ("FOS") Banks, Watch Commander Tucker and the self-admitted
23 foot guide traveled to Tucson. *Id.* at 18:12-19:14. The agents met at a freeway off of Ajo
24 Way and the Interstate 19 in Tucson. *Id.* at 20:18-21. Agents Heredia and Diaz testified that
25 the self-described foot guide was transferred into the unmarked vehicle and driven to
26 President Street. Hrg' Tr. 11/20/2012 [Doc. 37] 20:22-21:5; 46:6-13; 74:18-75:1. The foot
27 guide positively identified the stash house as they drove by. *Id*. at 20:22-21:21; 75:2-15.
28 Agent Diaz testified that they drove the car past the stash house, turned around, and the foot

1 guide positively identified the stash house a second time as the drove by again. *Id.* at 75:2-15; 89:6-18; 125:1-9. The agents then returned to the parking lot. *Id.* at 20:22-21:16; 89:15-18. Around midnight, the agents returned to the house identified by the foot guide to perform a knock-and-talk. *Id.* 47:3-10; 89:19-90:10; 91:9-15; 118:1-4.[1]

Agent Heredia testified that he, Watch Commander Tucker, and Agent Diaz approached the back door, with Agent Andreasen behind Agent Diaz. Hr'g Tr. 11/20/2012 [Doc. 37] at 25:16-21; 52:22-53:1. Agent Heredia further testified that the other agents were behind him. *Id.* at 27:17-20. Agent Andreasen testified that he stayed back from the first three agents to watch the east side of the house and rear windows during the initial encounter. *Id.* at 127:19-25. Agent Heredia testified that he was dressed in civilian clothing with his Border Patrol vest on and law enforcement badge around his neck. *Id.* at 23:9-17; 24:11-25:13. Watch Commander Tucker was wearing his Border Patrol uniform. *Id.* at 25:14-21; 26:1-4. Agent Diaz testified that he was wearing plain clothes with his Border Patrol vest. Hr'g Tr. 11/20/2012 [Doc. 37] at 75:24-76:21. Agent Andreasen also testified that he was wearing plain clothes with his Border Patrol vest. *Id.* at 118:8-13. Although armed, none of the agents had their guns drawn. *Id.* at 27:7-10.

Agent Heredia testified that he followed the directions of the foot guide, performed the knock and answered in Spanish when prompted by "Carlos." *Id.* at 21:24-22:15. Agent Heredia identified "Carlos" as Defendant Poom-Medina. *Id.* at 22:18-25. Agent Heredia further testified that when "Carlos" opened the door, Agent Heredia identified himself as a Border Patrol agent in both English and Spanish. Hr'g Tr. 11/20/2012 [Doc. 37] at 26:11-18;

---

[1]Federal Public Defender Investigator Annabella Santa Maria testified that she "went to the home on 323 East President Street and took photographs . . . [a]t least three times." Hr'g Tr. 11/14/2012 [Doc. 37] at 143:9-13. The first time she visited the property was on July 12, 2012. *Id.* at 143:14-15. Investigator Santa Maria also testified that although she was sent to locate 323 East President, she could not. *Id.* at 150:19-151:2. Moreover, Investigator Santa Maria testified inconsistently whether the houses that she photographed were units at 321 versus 323 East President street. *Id.* at 151:3-25. The Court finds the precise address is irrelevant. Agents Heredia, Diaz and Andreasen each confirmed that the foot guide unequivocally identified the house relevant to their investigation.

1  53:17-19; *see also id.* at 77:11-18 (Agent Diaz confirming Agent Heredia's testimony); *id.*
2  at 128:22-129:10 (Agent Andreasen confirming Agent Heredia's testimony). Agent Heredia
3  informed Defendant that the agents had information that the house might be a stash house,
4  and asked about Defendant's citizenship. *Id.* at 26:5-18; 53:20-24; *see also id.* at 77:11-18
5  (Agent Diaz confirming Agent Heredia's testimony); *id.* at 128:7-129:10 (Agent Andreasen
6  confirming Agent Heredia's testimony). Defendant responded that he was a United States
7  citizen. *Id.*; *see also id.* at 128:22-129:10 (Agent Andreasen confirming Agent Heredia's
8  testimony). Agent Heredia requested Defendant's permission to go into the house to check
9  for undocumented aliens, and Defendant verbally consented. *Id.* at 26:11-23; 58:14-18; 59:1-
10 6; *see also id.* at 77:11-18 (Agent Diaz confirming Agent Heredia's testimony); *id.* at 128:22-
11 129:10 (Agent Andreasen confirming Agent Heredia's testimony). Agent Heredia testified
12 that no coercive statements or threats were issued by the agents, and Defendant consented
13 without hesitation. *Id.* at 28:3-16; *see also id.* at 77:19-78:11 (Agent Diaz confirming Agent
14 Heredia's testimony). Defendant's demeanor was calm throughout the operation. *Id.* at
15 28:11-16; 32:21-23; 34:11-16; 77:19-23; 132:6-7. Upon Defendant's consent, Agent Heredia
16 pulled him to the side and stayed with him, while Watch Commander Tucker, Agent Diaz
17 and Agent Andreasen entered the house. Hr'g Tr. 11/14/2012 [Doc. 37] at 28:17-22; 29:8-
18 17; 63:10-15; 78:12-17; 109:23-110:3. Agent Heredia testified that pulling an occupant to
19 the side while a consensual search is performed is for everyone's safety. *Id.* at 28:17-22;
20 29:8-17; 30:2-11; 59:1-6; *see also id.* at 109:23-110:1 (Agent Diaz confirming Agent
21 Heredia's testimony); 121:8-10 (Agent Andreasen confirming Agent Heredia's testimony).

22      The "stash house" was very small, without any furniture except a mattress and
23 television set. *Id.* at 28:23-29:7; 62:19-63:2; 70:13-71:10; 78:18-25; 79:12-80:2; 97:6-11;
24 119:10-12. Agents did not find any one else in the home *Id.* at 79:7-11. Agent Diaz, the
25 second agent into the house, testified that he found an unloaded shotgun in an open closet.
26 *Id.* at 78:12-17; 80:3-17; 102:6-19. Upon finding the weapon, Agent Diaz alerted the other
27 agents. *Id.* at 80:3-17. Agents Heredia and Diaz asked Defendant whether or not the weapon
28 was his. Hr'g Tr. 11/14/2012 [Doc. 37] at 30:14-23; 81:5-19. The Defendant claimed that

1  the shotgun was his, but that his "friend" Guero had purchased it for him for protection,
2  because Defendant was in the process of becoming a United States citizen. *Id.* at 30:14-23;
3  31:9-32:15; 64:5-16; 81:5-19. When asked again about his immigration status, Defendant
4  admitted that he was not in the country legally, but reiterated that he was in the process of
5  gaining legal status to stay in the United States through marriage. *Id.* at 30:24-33:18; 81:9-
6  82:20. Agents gave Defendant the opportunity to look for paperwork to support his story,
7  but he could not produce any. *Id.* at 33:6-18; 82:12-20; 83:3-9. Agents placed Defendant
8  under arrest and read him his *Miranda* warnings. *Id.* at 34:20-35:14; 64:20-65:13.

## II. ANALYSIS

Defendant contests (1) the warrantless search of his house, arguing that his consent was not voluntary and (2) the failure to give Defendant his *Miranda* rights, arguing that the in home statements should be suppressed.

### *A.     Knock-and-Talk*

"A Fourth Amendment 'search' occurs when the government infringes on a subjective expectation of privacy that society is prepared to recognize as reasonable." *United States v. Pope*, 686 F.3d 1078, 1081 (9th Cir. 2012) (citing *Katz v. United States*, 389 U.S. 347, 360-61, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). "[T]he basic rule [is] that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" *Arizona v. Gant*, 556 U.S. 332, 338, 129 S.Ct. 1710, 1716, 173 L.Ed.2d 485 (2009) (quoting *Katz*, 389 U.S. at 357, 88 S.Ct. 507, 19 L.Ed.2d 576). It is well settled law "that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043-44, 36 L.Ed.2d 854 (1973).

"[T]he Fourth and Fourteenth amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the

coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at 228, 93 S.Ct. at 2048. "Whether consent to search was voluntarily given is 'to be determined from the totality of all the circumstances.'" *United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004) (quoting *Schneckloth*, 412 U.S. at 222, 93 S.Ct. at 2041). "[F]ive factors are to be considered in determining the voluntariness of consent to a search[;]" however, these factors are guideposts, and should not be considered a checklist for the Court's review. *Patayan Soriano*, 361 F.3d at 502. The five factors are as follows: "(1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Patayan Soriano*, 361 F.3d at 502 (quoting *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002)). The Government bears "the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. State of North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Furthermore, "[a] district court's finding that a person consented to a search is generally treated as a factual determination, reversible only if clearly erroneous." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990).

The Ninth Circuit Court of Appeals has recently recognized that "it remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the house." *United States v. Perea-Rey*, 680 F.3d 1179, 1187-88 (9th Cir. 2012). The Supreme Court of the United States has delineated that "only objective factors lend themselves to analysis under the Fourth Amendment's reasonableness standard." *Id.* (citing *Kentucky v. King*, – U.S. –, 131 S.Ct. 1849, 1859, 179 L.Ed.2d 865 (2011)). Moreover, an "'officer [initiating] a 'knock and talk' visit may approach any part of the building where uninvited visitors could be expected.'" *Id.* at 1188 (quoting *United States v. Titemore*, 335 F.Supp.2d 502, 505-06 (D.Vt. 2004), *aff'd*, 437 F.3d 251 (2d Cir. 2006)) (alterations in original). "Officers conducting a knock and talk

1 . . . need not approach only a specific door if there are multiple doors accessible to the
2 public." *Id.*

3       The Ninth Circuit Court of Appeals has also affirmed that no suspicion needed to be
4 shown in order to justify a "knock and talk" and an officer's actions were properly compliant
5 with the Fourth Amendment given her brief knocking and lack of police demand to open the
6 door. *U.S. v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000). Similarly, a "knock and talk"
7 in which multiple officers were present, but the approach was non-coercive is acceptable.
8 *U.S. v. Crasper*, 472 F.3d 1141, 1146 (9th Cir. 2007).

9       Defendant argues that the situation was inherently coercive and that the fact that he
10 "allegedly gave [the agents] permission to enter his home is of no moment." Def.'s Mot. to
11 Suppress [Doc. 25] at 4. Here, Border Patrol agents testified that three of them approached
12 the house, and Agent Heredia knocked on the back door. Hr'g Tr. 11/20/2012 [Doc. 37] at
13 25:16-21; 52:22-53:1. Agent testified to their objective intent to make contact with "Carlos"
14 and request entry. *Id.* at 15:15-16:6; 18:12-19:14. All were wearing clothing that clearly
15 identified them as law enforcement, and none had their weapons drawn. *Id.* at 23:9-17;
16 24:11-25:13; 25:14-21; 26:1-4; 27:7-10; 75:24-76:21; 118:8-13. Agent Heredia further
17 testified that when "Carlos" opened the door, Agent Heredia identified himself as a Border
18 Patrol agent in both English and Spanish. Hr'g Tr. 11/20/2012 [Doc. 37] at 26:11-18; 53:17-
19 19; *see also id.* at 77:11-18 (Agent Diaz confirming Agent Heredia's testimony); *id.* at
20 128:22-129:10 (Agent Andreasen confirming Agent Heredia's testimony). Agent Heredia
21 informed Defendant that the agents had information that the house might be a stash house,
22 and asked about Defendant's citizenship. *Id.* at 26:5-18; 53:20-24; *see also id.* at 77:11-18
23 (Agent Diaz confirming Agent Heredia's testimony); *id.* at 128:7-129:10 (Agent Andreasen
24 confirming Agent Heredia's testimony). Defendant responded that he was a United States
25 citizen. *Id.*; *see also id.* at 128:22-129:10 (Agent Andreasen confirming Agent Heredia's
26 testimony). Agent Heredia requested Defendant's permission to go into the house to check
27 for undocumented aliens, and Defendant verbally consented. *Id.* at 26:11-23; 58:14-18; 59:1-
28 6; *see also id.* at 77:11-18 (Agent Diaz confirming Agent Heredia's testimony); *id.* at 128:22-

- 7 -

129:10 (Agent Andreasen confirming Agent Heredia's testimony). The Court finds Agents Heredia, Diaz and Andreasen's testimony credible. Nothing in their testimony suggests that Defendant's consent was anything but voluntary. *See id.* at 28:11-16; 32:21-23; 34:11-16; 77:19-23; 132:6-7. Based upon the totality of the circumstances, the Court finds that Defendant voluntarily consented to the search by Border Patrol. As such, the Magistrate Judge recommends that Defendant's motion to suppress regarding the warrantless search of his house should be denied.

### *B.    Miranda Warnings*

The Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). This definition was refined to recognize that "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). As such, "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689.

"An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances where the individual is 'in custody.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)). "To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). This is an objective test. *Id.* In *Kim*, the

1 Ninth Circuit Court of Appeals relied on five factors in determining whether an interrogation
2 is custodial, *i.e.* whether "the officers established a setting from which a reasonable person
3 would believe that he or she was not free to leave." *Kim*, 292 F.3d at 974. These factors are:

    (1) the language used to summon the individual;
    (2) the extent to which the defendant is confronted with evidence of guilt;
    (3) the physical surroundings of the interrogation;
    (4) the duration of the detention; and
    (5) the degree of pressure applied to detain the individual.

7 *Kim*, 292 F.3d at 974 (citations omitted). "Whether a person is in custody for purposes of
8 *Miranda* is answered by reviewing the totality of facts involved at the time of the alleged
9 restraint." *United States v. Allen*, 699 F.2d 453, 458 (9th Cir. 1982).

10     The question of whether a person is "in custody" for *Miranda* purposes "is a mixed
11 of law and fact warranting *de novo* review." *Kim*, 292 F.3d at 973 (citations omitted). "The
12 factual findings underlying the district court's decision, however, are reviewed for clear
13 error." *Id.* (citations omitted).

14     Defendant assumes, without more, that he was in custody at the time of the
15 "interrogation." This is based upon the number of agents and time of night. In this case,
16 Agent Heredia testified that no coercive statements or threats were issued by the agents, and
17 Defendant consented to the search without hesitation. *Id.* at 28:3-16; *see also id.* at 77:19-
18 78:11 (Agent Diaz confirming Agent Heredia's testimony). Defendant's demeanor was calm
19 throughout the operation. *Id.* at 28:11-16; 32:21-23; 34:11-16; 77:19-23; 132:6-7. Upon
20 Defendant's consent, Agent Heredia pulled him to the side and stayed with him, while Watch
21 Commander Tucker, Agent Diaz and Agent Andreasen entered the house. Hr'g Tr.
22 11/14/2012 [Doc. 37] at 28:17-22; 29:8-17; 63:10-15; 78:12-17; 109:23-110:3. Agent
23 Heredia testified that pulling an occupant to the side while a consensual search is performed
24 is for everyone's safety. *Id.* at 28:17-22; 29:8-17; 30:2-11; 59:1-6; *see also id.* at 109:23-
25 110:1 (Agent Diaz confirming Agent Heredia's testimony); 121:8-10 (Agent Andreasen
26 confirming Agent Heredia's testimony). Agent Heredia and Defendant at the entrance of
27 Defendant's home while the search took place. *Id.* at 29:8-17. The detention was brief, as
28 Agent Diaz found the shotgun almost immediately. *Id.* at 102:6-19. Moreover, when

Defendant responded that he was in the process of gaining citizenship through marriage, the agents gave him an opportunity to look for paperwork to support his story, but Defendant could not produce any. *Id.* at 33:6-18; 82:12-20; 83:3-9. As such, agents placed Defendant under arrest and then read him his *Miranda* warnings. *Id.* at 34:20-35:14; 64:20-65:13. The Court finds the testimony of Agents Heredia, Diaz and Andreasen credible. Based upon the totality of the circumstances, the Magistrate Judge finds that Defendant was not in custody during the search, and as such *Miranda* warnings were unnecessary. He further recommends denial of Defendant's motion to suppress regarding the *Miranda* warnings.

## III. CONCLUSION

Defendant voluntarily consented to the search by Border Patrol agents. Additionally, he was not "in custody" while the search was being executed, and as such *Miranda* warnings were not necessary until he was placed under arrest.

## IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Defendant Carlos Poom-Medina's Motion to Suppress Evidence and Statements [Doc. 25].

Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). If objections are filed, the parties should use the following case number: **CR-12-1471-TUC-CKJ**.

. . .
. . .
. . .
. . .

Failure to file timely objections to any factual or legal determination of the Magistrate Judge in accordance with Fed. R. Crim. P. 59 will result in waiver of the right of review.

DATED this 11th day of December, 2012.

_____
Bruce G. Macdonald
United States Magistrate Judge